OPINION
{¶ 1} Appellant Carlos Kerby appeals from the denial of his pretrial suppression motion and his subsequent conviction in the Court of Common Pleas of Clark County for aggravated murder with a firearm specification, murder, aggravated robbery and felonious assault.
 {¶ 2} The record indicates that the following events took place leading to the arrest and conviction of Appellant:
 {¶ 3} On October 19, 2001, a customer going into Shuler's Bakery on East Main Street in Springfield observed a man approach the store with a gun. The man dropped the gun, retrieved it, and ran back to a dark blue Nissan truck, whereupon the truck left the scene. The customer called 9-1-1 and gave the dispatcher a description of the truck. The police found the truck in the parking lot of Kroger's grocery on East Main Street. With it, they found Appellant, Jawhan Massey, and Chris Berrian. They also found two guns, a BB gun and a .22 caliber revolver, and some clothing, including a red jogging suit, inside the truck. No charges were filed against Appellant.
 {¶ 4} Approximately one month later, three males attempted to rob the Family Video store on Sunset Avenue in Springfield early in the morning on November 28, 2001. Two store clerks were working on this night, Chad Tyler Kautz and Matthew Brown. Mr. Kautz saw the three men, one of whom was carrying a sawed-off, 20-gauge shotgun, approach the store; as a result, he attempted to call 9-1-1. The three men entered the outer vestibule of the store and demanded money from Matthew Brown, who was working at the counter. When they saw Mr. Kautz on the telephone, one of them fired a shotgun blast through the glass windows of the outer vestibule in Mr. Kautz's direction. 60 pellet strikes entered into the area where Mr. Kautz was on the telephone; the evidence shows that Mr. Kautz died of injuries related to this blast. Mr. Brown, upon hearing the "pump" of a shotgun, jumped out of the line of fire but was showered with pieces of glass that caused extensive physical injuries. He did, however, manage to talk with the 9-1-1 dispatcher. Mr. Brown told the dispatcher that three black men had just shot his fellow clerk with a shotgun. He also stated that the men were wearing blue masks, that one of them was wearing a red-hooded sweatshirt, and that all three assailants fled out the back of the video store toward Limestone Street on foot.
 {¶ 5} On November 30, 2001, an anonymous caller informed a 9-1-1 dispatcher that he had overheard a conversation between William Kerby and the caller's friend, William Kerby's brother-in-law, in which Mr. Kerby said he robbed the Family Video store. The caller stated that William Kerby was the shooter, and that Appellant and Terrence Kerby were also involved. In addition, the caller described the car that was present during the attempted robbery as a black Oldsmobile Cutlass Supreme, and he indicated that William Kerby probably kept guns in the trunk.
 {¶ 6} Also on November 30, 2001, Detective Darwin Hicks received an anonymous call at his desk from an individual who relayed identical information-the caller overheard William Kerby tell the caller's friend that he, Appellant and Terrence Kerby had attempted to rob the Family Video store. This conversation was not recorded; however, Detective Hicks submitted an inter-office memo containing the information from this call on December 4, 2001.
 {¶ 7} On December 1, 2001, Detective Douglas Estep personally observed Appellant, Jawhan Massey, and another male together outside the Kerbys' residence on Rice Street in Springfield. The three men were standing around a black Oldsmobile Cutlass Supreme. Detective Estep drove down the street and returned. That time he saw a maroon Oldsmobile also in the driveway. The three men appeared to be cleaning out the maroon automobile's trunk.
 {¶ 8} As part of a drug unit surveillance, Detective Jeffrey Flores observed Appellant, Suzanne Schnell, and an unidentified male driving around Springfield on December 3, 2001. He followed the three individuals to the Indiana State line. Jawhan Massey later stated in an interview to the police that he was present with Appellant and Ms. Schnell when they drove to Indiana.
 {¶ 9} On December 12, 2001, the Springfield police wired Tyrone Knight in order to record a conversation between Mr. Knight and Jawhan Massey. Mr. Knight had been apprehended in Greene County on a prior warrant. The taped conversation was not admitted into evidence because of its poor quality; however, Mr. Knight later discussed its contents with Detectives Estep, Hicks and Bell. Mr. Knight told the detectives that Mr. Massey said he and "Los" did the video store robbery. According to Mr. Knight, "Los" is short for Carlos, i.e., Carlos Kerby. Mr. Massey also told Mr. Knight that there was a girl who drove the car. Furthermore, Mr. Massey indicated to Mr. Knight that he used a 12-gauge shotgun, and that it took him two hours to saw off the end. In reference to Chad Kautz, the clerk who was shot at Family Video, Mr. Massey told Mr. Knight that shooting him was not intentional, but Mr. Kautz would not put the phone down. Finally, Mr. Massey discussed robbing Little Caesar's on Fountain Street and Cassano's that night, and his plan was to do so using a knife.
 {¶ 10} In a second taped conversation on December 12, 2001 between Tyrone Knight and Jawhan Massey, Mr. Massey made further references to robbing Little Caesar's and to "Los" who lives in Donnelsville. Suzanne Schnell, Appellant's girlfriend, lived in Donnelsville, and Appellant moved in with her in the beginning of December 2001. Mr. Massey was arrested later that night outside of a Sunoco gas station on Limestone Street.
 {¶ 11} At approximately 10:16 p.m. on December 12, 2001, Detectives Estep and Hicks interviewed Jawhan Massey. During the interview, Mr. Massey told the detectives that Will Kerby had been carrying out robberies all around Springfield. He further said that Will Kerby drove a maroon Cutlass or Monte Carlo, and he carried a .20 caliber shotgun. Mr. Massey also indicated that he knew Carlos Kerby, but he said he did not call him "Los." Later on, when asked specifically about the Family Video attempted robbery, Mr. Massey denied his own involvement and suggested that he lied to others about doing it. He indicated that he was afraid Will Kerby would kill him if he found out that Mr. Massey had told others Will Kerby actually committed the shooting and attempted robbery. Finally, Mr. Massey implicated Appellant and Terrence Kerby, a.k.a. T-Curt, as being involved with the Family Video incident.
 {¶ 12} Early the next morning, at approximately 1:35 a.m., the Springfield police recorded a telephone conversation between Jawhan Massey and Appellant. During the course of the conversation, Mr. Massey asked Appellant if he was "all right about the situation." (Tr. at 307.) Appellant simply replied that he was "straight." (Id.) Mr. Massey also asked what happened to the gun that was used, to which Appellant answered that his brother had taken care of it.
 {¶ 13} Within the next hour, approximately five Springfield police officers in three police vehicles arrived at Suzanne Schnell's residence. When the police knocked on the front door and identified themselves, Ms. Schnell indicated that it would not open, so several officers went to the back of the house while the others remained in front. Appellant was upstairs at that time. When Appellant came downstairs, he was not clothed; as a result, the officers sent Ms. Schnell upstairs to retrieve some clothes for him. When everyone was downstairs, the officers told Appellant and Ms. Schnell that they wanted to take them to police headquarters in order to talk. More specifically, one officer asked Appellant, "You know why we are here, don't you?" (Tr. at 320.) Appellant replied by nodding his head. At no time was Appellant told he was allowed to leave, nor was he told that he was under arrest.
 {¶ 14} Ms. Schnell and Appellant were escorted to police headquarters in separate vehicles. Detective Estep sat next to Appellant. During the suppression hearing, Detective Estep testified that Appellant was in custody at that point. (Tr. at 350.)
 {¶ 15} At the police station, Appellant was taken to an interview room. The room was approximately six feet by six feet in size, with no windows and one door that remained unlocked at all times. Present in the room with Appellant were Lieutenant David Swords and Sergeant Barry Eggers. The interview lasted just over one hour. During this time, Appellant confessed to being involved with the shooting and attempted robbery at Family Video on the night of November 28. He also informed the officers that Will Kerby and Jawhan Massey were with him-Will Kerby supplied the sawed-off shotgun, and Jawhan Massey pulled the trigger.
 {¶ 16} Appellant was indicted for the charges of aggravated murder, murder, aggravated robbery, and felonious assault, all with firearm specifications. On January 18, 2002, he pled not guilty to this indictment.
 {¶ 17} Appellant filed a motion to suppress evidence on February 19, 2003. Following a four day hearing, the trial court denied this motion in an Entry dated June 20, 2003. Appellant changed his initial not-guilty plea to a plea of no contest on June 25, 2003. In a judgment entry dated July 25, 2003, Appellant was convicted of aggravated murder with a firearm specification, murder, aggravated robbery and felonious assault. The court found that the firearm specifications included with the charges of murder, aggravated robbery, and felonious assault merged with the firearm specification in the aggravated murder charge. Furthermore, the court found that the charge of murder merged with the charge of aggravated murder for the purpose of sentencing. Consequently, Appellant was sentenced to life imprisonment with the eligibility of parole after 27 years.
 {¶ 18} A notice of appeal was filed with this court on August 18, 2003. On September 23, 2005, Appellant's appointed counsel, Charles A. McKinney, filed a motion to dismiss the appeal, stating that Appellant's non-frivolous arguments were not supported by Ohio law. This court construed the motion as a brief filed pursuant to Anders v.California (1967), 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493. In a Decision and Entry filed February 23, 2006, we held that there was a non-frivolous issue as to whether Appellant's confession was voluntary; thus, we set aside the Anders brief, permitted Mr. McKinney to withdraw, and appointed new counsel to brief the issue of voluntariness and other issues counsel determined to be relevant. John J. Scaccia was appointed counsel for Appellant on March 24, 2006.
 I {¶ 19} On appeal, Appellant raises one assignment of error: "The trial court erred as a matter of law when it overruled the defendant's motion to suppress statements made because an illegal arrest was made on Mr. Kerby and the confession was involuntary." Specifically, Appellant argues that he was unlawfully arrested in the early morning of December 13, 2001 because the officers lacked the requisite probable cause to take him into custody against his own free will; as a result, Appellant asserts that his confession must be suppressed under the fruit of the poisonous tree doctrine. Should the court find that there was probable cause to seize him, Appellant further argues that his confession was involuntary because it was obtained through the use of coercion and deception, along with tactics inducing fright and despair.
 {¶ 20} This court has recognized that the trial court serves as the trier of fact at a suppression hearing; thus, it must judge the credibility of the witnesses and the weight of the evidence. State v.Fanning (1982), 1 Ohio St.3d 19, 20, 437 N.E.2d 583. "In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts found." State v. Hurt, Montgomery App. No. 21009,2006-Ohio-990, at ¶ 16 (citations omitted). Hence, this determination requires an independent review, without deference to the trial court's conclusions. State v. Petitjean (2000), 140 Ohio App.3d 517, 533,748 N.E.2d 133 (citations omitted).
 {¶ 21} Upon review of the record, we hold that probable cause existed on December 13, 2001 to arrest Appellant; however, the evidence fails to demonstrate that Appellant's confession was voluntary. Therefore, we conclude that the trial court erred in overruling Appellant's motion to suppress. Accordingly, the judgment of the trial court will be reversed, and the matter will be remanded for further proceedings consistent with this opinion.
 II {¶ 22} Under his sole assignment of error, Appellant first contends that he was held in custody pursuant to an unlawful arrest when the Springfield police took him to police headquarters early in the morning on December 13, 2001. We agree.
 {¶ 23} This court has stated that "[a] seizure is an arrest * * * if a `reasonable person' in the suspect's position would have understood the situation to constitute a restraint on his freedom of movement of the degree the law associated with formal arrest." State v. Hatch, Montgomery App. No. 18986, 2002-Ohio-55, 2002 WL 10449, at *4, citingUnited States v. Carral-Franco (C.A. 5, 1988), 848 F2d. 536. This is an objective determination based on the circumstances; consideration should not be made regarding the subjective views of the officers or the suspect. Stansbury v. California (1994), 511 U.S. 318, 323,114 S.Ct. 1526, 128 L.Ed.2d 293. In Stansbury, the Court held that "an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would haveaffected how a reasonable person in that position would perceive his orher freedom to leave." (Emphasis added.) Id. at 325.
 {¶ 24} During the suppression hearing in the case at hand, Lieutenant David Swords and Detective Douglas Estep testified that approximately five police officers in three police vehicles went to the home of Appellant's girlfriend, Suzanne Schnell, at 2:10 a.m. on December 13, 2001 to "pick up" Appellant. (Tr. at 346; 493.) At the door, they identified themselves as police officers to Ms. Schnell, who consented to their entrance. Inside, Appellant was not told that he was under arrest when confronted by three officers, some of whom were armed at the time; instead, the officers said they wanted to take him to headquarters to talk. Detective Estep further testified, however, that Appellant was not told that he could leave at any point, nor was he told that he could refuse to talk with the officers. In fact, the detective stated that Appellant would not have been allowed to leave even if he had requested. Moreover, Detective Estep testified that he couldn't remember whether Appellant was handcuffed, but he did provide that Appellant was escorted to police headquarters in the back of a cruiser with the detective at his side.
 {¶ 25} At the station, Appellant was immediately taken to an interrogation room where he was questioned by Lieutenant David Swords and Sergeant Barry Eggers. Not long into the interrogation, but after Appellant was read and waived his Miranda rights, Sergeant Eggers told Appellant, "You need to tell us the truth because you're not walking out of here." (Tr. at 412.)
 {¶ 26} It is this court's opinion that a reasonable person in Appellant's position would have understood the actions taken by the police officers to restrain his freedom of movement to the same degree associated with a formal arrest. "[A] group of police officers rousing an adolescent out of bed in the middle of the night with the words `we need to go and talk' presents no option but `to go.' " Kaup v.Texas (2003), 538 U.S. 626, 631, 123 S.Ct. 1843, 155 L.Ed.2d 814.
 {¶ 27} In Kaup, the United States Supreme Court held that a 17-year-old boy was taken into custody where he was awakened at three in the morning by police officers; told he needed to go and talk; escorted out of his home in handcuffs, boxer shorts, and without shoes; driven to the crime scene; and finally taken to an interrogation room at the sheriff's office for questioning. Id. at 631. According to the Court, the conduct of the police officers exemplified the probative circumstances that indicate a seizure, even where the person being seized did not attempt to leave, as set forth in United States v.Mendenhall (1980), 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497. These circumstances include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. at 554.
 {¶ 28} Here, Appellant was confronted by five police officers, some of whom were armed, at 2:10 a.m., and he was told that the officers wanted to take him to headquarters for questioning. Whether the officers believed Appellant was under arrest or would be allowed to leave is irrelevant. At this point, a reasonable person might have begun to feel the restraints on his freedom. Then, the officers put Appellant in the back of a police cruiser with a detective and drove him to headquarters. A reasonable person's only option would have been to ask that the officers turn around and take him home because he had decided not to comply with their requests. This court finds that scenario to be highly implausible. Finally, Appellant was led to an interrogation room where he was told that he would not be permitted to leave. There is no doubt that a reasonable person in Appellant's position would have understood these events to mean that he was under arrest.
 {¶ 29} Based on these facts, we agree with Appellant's first claim that he was taken into custody when the officers came to his house during the early morning hours of December 13, 2001, and escorted him to police headquarters for questioning.
 {¶ 30} Appellant next argues that the officers lacked the requisite probable cause to arrest him at the time he was taken into police custody; as a result, he contends that all evidence obtained from the unlawful arrest must be suppressed pursuant to the fruit of the poisonous tree doctrine. We find this argument lacks merit.
 {¶ 31} Arresting officers must possess probable cause to believe that a suspect has committed a felony when making a warrantless arrest.State v. Cracraft (Dec. 29, 1995), Montgomery App. No. CA14809,1995 WL 766011, at *3 (citations omitted). Probable cause to arrest exists when "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio (1964), 379 U.S. 89, 91,85 S.Ct. 223, 13 L.Ed.2d 142. See, also, State v. Timson (1974),38 Ohio St.2d 122, 311 N.E.2d 16, at paragraph one of the syllabus. Moreover, probable cause is a concept that must be based on the totality of the circumstances because it "deals with probabilities-the factual and practical nontechnical considerations of everyday life on which reasonable and prudent men act * * * ." State v. Snyder (Aug. 10, 1994), Montgomery App. No. 14089, 1994 WL 420918, at *2 (citations omitted).
 {¶ 32} When considered in their aggregate, there are a number of facts and circumstances in the present case warranting the arresting officers' belief that Appellant had participated in the shooting and attempted robbery at Family Video on November 28, 2001. First, the police made several observations that confirmed Appellant's association with co-defendant Jawhan Massey. On October 19, 2001, Appellant was found in the parking lot of Kroger's on East Main Street with Mr. Massey and one other male after an eyewitness had informed a 9-1-1 dispatcher that a man with a gun had approached Shuler's Bakery, also on East Main Street, but had retreated in a blue Nissan truck. The police found Appellant in that truck; they also found a BB gun and .22 caliber revolver. On December 1, 2001, Appellant and Mr. Massey were seen outside the Kerbys' residence on Rice Street working around a black Oldsmobile Cutlass Supreme and a maroon Oldsmobile. An anonymous tip would later offer that the suspects in the Family Video shooting and attempted robbery drove a black Oldsmobile Cutlass Supreme, and that co-defendant Will Kerby kept guns in the trunk. On December 3, 2001, a Springfield drug unit surveillance officer followed Appellant, his girlfriend, and co-defendant Massey as they drove around Springfield and eventually crossed the Indiana State line.
 {¶ 33} Next, the record demonstrates that there were two anonymous phone calls in which the caller alleged Appellant's involvement in the shooting at Family Video. On November 30, 2001, an anonymous caller told the police that he had overhead a conversation between William Kerby and William Kerby's brother-in-law, the caller's friend, in which Mr. Kerby admitted to taking part in the robbery and shooting. According to the caller, Mr. Kerby was the shooter, while Appellant and Terrence Kerby were present. The caller also described the car that Appellant drove as a black Oldsmobile Cutlass Supreme, stating that he was following Appellant and his girlfriend at the time of the call. Also on November 30, 2001, an individual called Detective Darwin Hicks and informed him of the identical information.
 {¶ 34} Finally, the record shows that the police relied on several circumstances involving informants to warrant their belief of Appellant's participation in the shooting. On December 12, 2001, the Springfield police recorded a conversation between informant, Tyrone Knight, and co-defendant, Jawhan Massey. The quality of this recording prevented it from being admitted into evidence; however, the record reflects that there was a follow-up conversation between Mr. Knight and Detectives Estep, Hicks and Bell. Mr. Knight informed the detectives that Mr. Massey admitted to shooting Chad Kautz at Family Video on November 28, 2001, and that Appellant was with him at the time. (Tr. at 38; 48.) Furthermore, Mr. Massey told Mr. Knight that he did not intend to shoot Mr. Kautz, but Mr. Kautz refused to put down the telephone. Regarding the weapon used in the shooting, Mr. Massey said that he used a 12-gauge shotgun, and he spent two hours sawing off its end. The main focus of this conversation, however, was on Mr. Massey's plans to rob Little Caesar's on Fountain Street and Cassano's that night with the help of Mr. Knight.
 {¶ 35} Later that same night, the police recorded a second conversation between Mr. Knight and Mr. Massey. Although they did not discuss the Family Video incident, Mr. Massey made further references to robbing Little Caesar's. He also indicated that he wanted to include Appellant in the robberies: "I wish I could get into my nigger Los before he get out of work and have a-go out to his house, man. He lives in-he lives in-what's that called? Donnelsville? Donnelsville." (Tr. at 72.) Mr. Massey was subsequently arrested and interviewed later that night.
 {¶ 36} During his interview with the police, co-defendant Massey stated that Appellant, Will Kerby, and Terrence Kerby committed the shooting and attempted robbery at Family Video on November 28, 2001. When asked about his own involvement, he denied it; however, he told the police that he had to lie about taking part in the incident in order to keep Will Kerby from killing him.
 {¶ 37} Early the next morning, the police recorded a telephone conversation between Mr. Massey and Appellant. Impliedly referring to the shooting at Family Video, Mr. Massey asked Appellant if he was "all right about the situation." (Tr. at 307.) Appellant responded with, "Yeah, I'm straight." (Id.) Mr. Massey also asked what happened to the gun, to which Appellant replied, "Oh, my brother got it taken care of." (Id.)
 {¶ 38} In reliance on the foregoing facts and circumstances, the Springfield police took Appellant into custody at approximately 2:30 in the morning on December 13, 2001. We believe that this reliance was reasonable because these facts in their aggregate establish a fair probability that Appellant was involved in the shooting and attempted robbery. When dealing with probable cause, we are not making the determination that proof beyond a reasonable doubt exists implicating a suspect's involvement in a crime. As we stated above, probable cause deals with probabilities — its existence rises from a common sense, practical consideration of interrelated facts and events leading a reasonable and prudent person to act. State v. Snyder (Aug. 10, 1994), Montgomery App. No. 14089, 1994 WL 420918, at *2 (citations omitted). From their own observations, the police were able to determine that a relationship existed between Appellant and co-defendant, Jawhan Massey. Mixed in with this relationship were several instances of conduct that could reasonably induce a suspicion of criminal activity when considered under the totality of the circumstances.
 {¶ 39} Moreover, a variety of sources alleged Appellant's involvement. Appellant argues that the information derived from these sources, particularly from Mr. Knight and Mr. Massey, constitute hearsay evidence, and thus, is impermissible and unreliable. We have held before that the hearsay exclusionary rule does not apply in a suppression hearing, for the determination of probable cause "depends upon the information relayed to [the officers] and whether they could reasonably have relied upon it, based upon what they knew at the time." State v.Bishop, Clark App. No. 2003-CA-37, 2004-Ohio-6221, at ¶ 16. In this context, the statements of others are not being offered to prove the truth of the matter asserted; instead, they are offered to prove that the officers relied upon them in deciding whether to arrest the suspect. Id. Although the evidence includes some inconsistencies, the information obtained from both Mr. Knight and Mr. Massey, in concert with the tips from the anonymous caller, contains one common element-Appellant was among the men who attempted to rob Family Video on November 28, 2001. The officers relied upon these statements in making their decision to take Appellant into custody.
 {¶ 40} The record also demonstrates that there were facts corroborating information obtained from the anonymous caller and from Mr. Massey, per Mr. Knight and during his own police interview. For example, the colors, makes, and models of both Appellant's and William Kerby's vehicles were accurately identified. Also, it was determined that a sawed-off shotgun was used during the incident. Mr. Massey revealed this in his recorded conversations with Mr. Knight and with Appellant. Most importantly, each source's account of the incident included the presence of Appellant and William Kerby at the scene of the crime. We do not agree with Appellant's assertion that the information used by the police was completely void of any indicia of reliability.
 {¶ 41} Based upon the totality of the circumstances, we cannot say that the police lacked probable cause to believe that Appellant had participated in the shooting and attempted robbery at Family Video. The facts and circumstances upon which the officers relied were sufficient to warrant taking Appellant into custody on the morning of December 13, 2001. Thus, Appellant's argument that the arrest was unlawful, and that any evidence obtained as a result of it must be suppressed, is without merit.
 III {¶ 42} The second argument made by Appellant under his sole assignment of error is that his confession to the Springfield police was involuntary. Specifically, Appellant claims that his confession was the result of coercion, deception, fright and despair when considered under the totality of the circumstances.
 {¶ 43} The Fifth Amendment to the Constitution of the United States and Article 1, Section 10 of the Ohio Constitution provide that no individual shall be compelled to be a witness against himself or herself in any criminal case. An individual may waive this protection; however, waiver must be voluntary. In determining whether a suspect has voluntarily waived the privilege against self-incrimination, a court "should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."State v. Edwards (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051, at paragraph two of the syllabus, vacated on other grounds (1978), 438 U.S. 911,98 S.Ct. 3147, 57 L.Ed.2d 1155; State v. Brown, 100 Ohio St.3d 51,2003-Ohio-5059, 796 N.E.2d 506, at ¶ 13.
 {¶ 44} In the present case, Appellant claims that his confession to the police was not voluntary because he was 17 at the time and his parents were not present during his arrest and interrogation, and the officers questioning him made statements of deception and exaggeration. When considering the totality of the surrounding circumstances, we agree that Appellant did not voluntarily waive his right against self-incrimination.
 {¶ 45} The record shows that Appellant was 17 at the time he was interrogated, and he was completing his sophomore year in high school. In State v. Bell (1976), 48 Ohio St.2d 270, 358 N.E.2d 556, reversed on other grounds (1978), 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010, the Ohio Supreme Court held that determining whether a minor intelligently and voluntarily waives his rights during an interrogation cannot always be decided by the same criteria applied to mature adults. Id. at 277. "Such criteria necessarily varies with certain factors as the age, emotional stability, physical condition, and mental capacity of the minor." Id. See, also, State v. Eglin (Dec. 21, 1983), Summit App. Nos. 11168/11201, 1983 WL 2257, at *3 (holding that a seventeen-year-old defendant adjudicated to stand trial as an adult should not be afforded as much protection as a very young child not capable of intelligently waiving his rights). Here, although Appellant was approximately seven months from reaching the age of maturity, the circumstances involving his personal life demonstrated his capacity to assume adult responsibilities. Appellant attended high school from 8:30 a.m. to 12:45 p.m. After school, he worked at Market USA, serving as a telemarketer. Prior to working at Market USA, Appellant was employed at Taco Bell. Furthermore, Appellant moved out of his parent's home on Rice Street and in with his girlfriend in Donnelsville one week prior to being taken into custody. Finally, the record does not indicate that Appellant lacked emotional stability or suffered from poor physical condition, nor does Appellant make such assertions in his argument. Based on these facts, we do not agree that Appellant's confession was involuntary simply because he was 17 years old at the time.
 {¶ 46} However, Appellant's age is relevant in supporting his claim that the officers used deceptive statements and exaggerations concerning the evidence they had obtained to secure his confession during the interrogation. Specifically, Appellant refers to the following statements of Sergeant Eggers and Lieutenant Swords, as transcribed from the State's Exhibit B:
 {¶ 47} "Sergeant Eggers: Well, Carlos, obviously we wouldn't come knocking at your door at 2 o'clock in the morning —
 {¶ 48} "Defendant Carlos Kerby: Uh-huh.
 {¶ 49} "Sergeant Eggers:-if we didn't feel like it was necessary for us to talk to you tonight.
 {¶ 50} "Defendant Carlos Kerby: All right.
 {¶ 51} "Sergeant Eggers: And I guess by talking to you, we're gonnagive you an opportunity to save yourself.
 {¶ 52} "Defendant Carlos Kerby: Okay.
 {¶ 53} "Sergeant Eggers: Because you've got to be straight with us.
 {¶ 54} "Defendant Carlos Kerby: All right, sir.
 {¶ 55} "Sergeant Eggers: Because we did our homework." (Emphasis added.) (Tr. at 407.)
 {¶ 56} "* * *
 {¶ 57} "Lieutenant Swords: This is serious, Carlos. This is very serious.
 {¶ 58} "Sergeant Eggers: We're gonna try you as an adult. This is acapital offense.
 {¶ 59} "Defendant Carlos Kerby: Yes, sir.
 {¶ 60} "Sergeant Eggers: This is big time, big league.
 {¶ 61} "Defendant Carlos Kerby: (Inaudible.)
 {¶ 62} "Lieutenant Swords: But you need to tell us the truth.
 {¶ 63} "Defendant Carlos Kerby: I'm telling you the truth.
 {¶ 64} "Sergeant Eggers: If you didn't pull the trigger, you need tosave your ass.
 {¶ 65} "Defendant Carlos Kerby: I did not pull the trigger. I wasn't there.
 {¶ 66} "Sergeant Eggers: You was [sic] there." (Emphasis added.) (Tr. at 410.)
 {¶ 67} "* * *
 {¶ 68} "Lieutenant Swords: You never thought-you never thought in the last two weeks that you'd be sitting here right now. What you got to think is where you gonna [sic] be two weeks from now? You never thought you'd be here, but here you are. Where are you gonna [sic] be two weeks from now? What are we gonna [sic] find out? What do we already know that we haven't discussed? Where are you gonna [sic] be two weeks from now? Where are you gonna [sic]-where's your life gonna [sic] go, Carlos? You're working. You've got a life. You've got a future. You're right on the threshold of-of your life. Where's it gonna [sic] go? You can't change what happened two weeks ago. You can only do your best to go from here where you need to go, and you know where you need to go with this. What happened happened, and you cannot change that. You cannot change that. You can only go from here. That's what you have to do. That's what you need to do. Maybe you're afraid of getting somebody else in trouble. Maybe you're afraid of getting yourself in trouble. But, Carlos, what happened happened. The truth is the only thing that you have going for you. That's the only thing you have to rely on. Your parents have taught you that. Your parents did not raise you to be here today. Your parents have taught you that. Tell the truth, haven't they?" (Tr. at 413-14.)
 {¶ 69} "* * *
 {¶ 70} "Sergeant Eggers: You've got to show-listen to me. You've go to show remorse for what happened. If you go through this and never show any remorse for what happened to that man, they are going to stakeyou.
 {¶ 71} "Lieutenant Swords: Are you sorry that man died? Are you, Carlos? Are you sorry that man died?
 {¶ 72} "(Defendant Carlos Kerby begins to cry.)
 {¶ 73} "Lieutenant Swords: I know you are. I know you are.
 {¶ 74} "Defendant Carlos Kerby: My mom and dad-(Inaudible.)
 {¶ 75} "Lieutenant Swords: How's that, Carlos?
 {¶ 76} "Defendant Carlos Kerby: Cause, man, I screwed. I shouldn't have been involved with-with them people. I shouldn't have been involved.
 {¶ 77} "Lieutenant Swords: I know that, but you were; and that's the time to get out of it.
 {¶ 78} "Sergeant Eggers: You can still make it up to her. You can be man enough to own up to what's happened here.
 {¶ 79} "Defendant Carlos Kerby: (Inaudible.)
 {¶ 80} "Lieutenant Swords: You'd be surprised how mothers understand.
 {¶ 81} "Defendant Carlos Kerby: I'm sorry. (Inaudible.)
 {¶ 82} "Lieutenant Swords: Who all was there, Carlos? Who all was there?
 {¶ 83} "Sergeant Eggers: Carlos, we already know the answers to our questions; but we've got to be able to show prosecutor [sic] that youare sorry for what happened. And the only way you're gonna [sic] convince anybody of that is if you tell us what happened." (Emphasis added.) (Tr. at 423.)
 {¶ 84} The suggestion that Appellant could face the death penalty for his involvement in the shooting was deceptively misleading and a misstatement of the law. In State v. Petitjean (2000),140 Ohio App.3d 517, 748 N.E.2d 133, this court provided that "false promises made by police to a criminal suspect that he can obtain lenient treatment in exchange for waiving his Fifth Amendment privilege so undermines the suspect's capacity for self-determination that his election to waive the right and incriminate himself in criminal conduct is fatally impaired. His resulting waiver and statement are thus involuntary for Fifth Amendment purposes. These issues must be resolved on a totality-of-the-circumstances test, which places both equivocal language and technical possibilities in context." Id. at 534. InPetitjean, interrogating officers told the defendant that he would probably get probation if he confessed to murder, where the crime itself was so violent in nature that the defendant would inevitably have been charged with voluntary manslaughter or murder. Id. at 532. The penalties under both of these charges did not include probation. Id.
 {¶ 85} We held that the officers' promise "specifically conditioned the availability of probation on [the defendant's] waiver of his Fifth Amendment privilege." Id. When considered together with the defendant's prior experience, the duration and tone of the investigation, the threats of punishment and the source of the promises, the officers' misstatement of the law equated to a grave misrepresentation of leniency that frustrated the voluntariness of the defendant's confession. Id. at 533-34.
 {¶ 86} In the present case, the officers' implication that Appellant could face the death penalty for his involvement with the shooting and attempted robbery is a similar misrepresentation that we believe undermined Appellant's ability to voluntarily waive his privilege against self-incrimination. At the time of being questioned, it was not unrealistic for the officers to know that Appellant would be charged with aggravated murder, R.C. 2903.01, and/or murder, R.C. 2903.02, if he confessed his involvement in the death of Chad Kautz at Family Video. They also were aware that Appellant was only 17. R.C. 2929.02(A) provides that "[w]hoever is convicted of or pleads guilty to aggravated murder in violation of section 2903.01 of the Revised Code shall suffer death or be imprisoned for life, * * * except that no person who raises the matter of age pursuant to section 2929.023 of the Revised Code and who is not found to have been eighteen years of age or older at the time of the commission of the offense shall suffer death." Under that same statute, a person found guilty of murder pursuant to R.C. 2903.02 could receive a sentence of imprisonment only.
 {¶ 87} At the beginning of his questioning, Sergeant Eggers specifically asked Appellant his date of birth, which was July 8, 1981. (Tr. at 401.) This made Appellant 17 at the time of the commission of the offense. Under the statute, this factor eliminated the possibility of death as one of Appellant's penalties. The record shows, however, that the officers attempted to create the impression that Appellant could be facing a death sentence unless he cooperated with them and confessed. Sergeant Eggers initially suggested that the purpose of the interrogation was to give Appellant "an opportunity to save [himself]." (Tr. at 407.) He continued by telling Appellant, "We're gonna try you as an adult. This is a capital offense." (Tr. at 410.) Throughout the interrogation, the officers strengthened the implication of the death penalty with threats such as "If you didn't pull the trigger, you need to save your ass"; "If you go through this and never show any remorse for what happened to that man, they are going to stake you"; and " * * * we've got to be able to show prosecutor [sic] that you are sorry for what happened." (Tr. at 410; 423.) The fact that these threats came from the same people who were attempting to appeal to Appellant's conscience, coupled with Appellant's lack of criminal experience and understanding of the law, leads us to conclude that the misstatement of the penalty under the statute deprived Appellant of his capacity to intelligently and voluntarily waive his Fifth Amendment rights. When considering the totality of the surrounding circumstances, these factors outweigh the influence of Appellant's maturity and the overall short duration of the interrogation. Thus, we find that the trial court erred in determining that Appellant's confession to the police was voluntary. Accordingly, his sole assignment of error is sustained.
 IV {¶ 88} Having sustained Appellant's sole assignment of error, we reverse the judgment of the trial court and remand this case for further proceedings consistent with this opinion. Appellant's oral and written statements made to the police during his interrogation on December 13, 2001 are ordered suppressed from use by the State in any subsequent proceeding. Any evidence derived from those statements is also suppressed. However, any evidence obtained by the police independent of Appellant's oral and written statements is not precluded from use.
GRADY, J., and DONOVAN, J., concur.