[Cite as *State v. Banks*, 2014-Ohio-1101.]

## IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

STATE OF OHIO                  :
                              :    Appellate Case No. 25572
    Plaintiff-Appellee       :
                              :    Trial Court Case No. 12-CR-1037
v.                            :
                              :
BRANDON K. BANKS              :    (Criminal Appeal from
                              :     Common Pleas Court)
    Defendant-Appellant      :
                              :

· · · · · · · · · · ·

O P I N I O N

Rendered on the 21st day of March, 2014.

· · · · · · · · · · ·

MATHIAS H. HECK, JR., by MICHELE D. PHIPPS, Atty. Reg. #0069829, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JOHN SCACCIA, Atty. Reg. #0022217, 1814 East Third Street, Dayton, Ohio 45422
    Attorney for Defendant-Appellant

· · · · · · · · · · · ·

FAIN, J.

{¶ 1}     Defendant-appellant Brandon K. Banks appeals from his conviction and sentence for one count of Aggravated Burglary, and one count of Disrupting Public Services.   Banks contends that the trial court improperly limited the scope of his cross-examination of a police officer at the hearing

on his motion to suppress statements he made to the police; that the trial court erred by overruling his Crim.R. 29 motion for a judgment of acquittal, made at the close of the State's case, on the charge of Disrupting Public Services; and that the trial court erred by both overruling his Crim.R. 29 motion for a judgment of acquittal, made at the close of the State's case, on the charge of Aggravated Burglary, and then allowing the State to amend the indictment.

{¶ 2} We conclude that the trial court did not err in sustaining an objection to a question Banks put to the police officer at the suppression hearing. We conclude that the trial court did not err in overruling his Crim.R. 29 motion for a judgment of acquittal on the charge of Disrupting Public Services. Finally, we conclude that the trial court did not err in overruling Banks's Crim.R. 29 motion for a judgment of acquittal on the charge of Aggravated Burglary, and did not commit plain error in permitting the amendment of the indictment by deleting reference therein to the specific crime that Banks was alleged to have intended to commit while trespassing in the victim's home.

## I. The Break-Up of a Relationship Is Followed by a Break-In

{¶ 3} In August 2011, Banks moved in with his girlfriend, Tiffany Janeway, the victim in this case. Banks had three young children; Janeway also had three young children.

{¶ 4} On or about March 31, 2012, Janeway asked Banks to move out. By either the next day, April 1st, or the day after that, April 2nd, Banks had completed the process of moving out. There had not been much acrimony. Banks left some pieces of furniture that belonged to him, allowing Janeway to have them.

{¶ 5} Janeway had two locks, one on her door handle, and above that, one dead-bolt lock. She had two sets of keys, one for the door handle lock, and one for the deadbolt.

**{¶ 6}** On April 2nd, Banks and Janeway conversed on the phone about two times, and also exchanged a few text messages. The last phone conversation, which Janeway conducted on her cell phone, ended at about 11:40 to 11:45 p.m., when she got a call from a friend on her home phone. During her phone conversation with her friend, a married man she had known for about fifteen years as just a friend, she received about six phone calls from Banks on her cell phone, which she did not take. She eventually turned her cell phone off, connected it to a charger, and put it on the arm of her sofa.

**{¶ 7}** The only other working phone in Janeway's residence was a phone with one base unit and two remote phones. She would use the remote phones alternately, with one re-charging on the base while she used the other. Neither remote would work without the base unit being plugged in.

**{¶ 8}** After about five to seven minutes on the phone to her friend, Janeway started hearing banging on her door. She determined that it was Banks knocking on her door, but did not respond, because she did not want to talk to him. About five minutes after that, Banks suddenly appeared in front of her. He had gained access by ripping through some plastic covering a bedroom window. At some point, either before or immediately after Banks's appearance, Janeway hung up her phone.

**{¶ 9}** Banks insisted on talking to Janeway. One of the first things he did was to unplug her home phone, and take her cell phone. Banks kept insisting that he and Janeway were still together; Janeway told Banks they were not.

**{¶ 10}** At Banks's direction, he and Janeway went into Janeway's daughter's room. There, he pushed her backwards into the desk in the room. Janeway testified that: "It was pretty

hard. It hurt my back a little bit." The push moved the desk and broke some of the things on the desk.

{¶ 11} Banks moved one of his hands across Janeway's chest, just below her throat. Although Banks did not grab Janeway by the throat, or squeeze, she began to fear that he would strangle her "because he was mad because I kept saying we weren't together."

{¶ 12} Janeway's three-year-old son was standing at the door. Janeway decided to try to calm Banks down by telling him that they were still together. This seemed to work. Janeway's son had not been feeling well. She decided to exaggerate his condition and tell Banks she needed to take her son to the hospital.

{¶ 13} Initially, Banks wanted to take Janeway and her son to the hospital, but he eventually agreed that she could go with her son, without Banks. She and Banks reached for the keys to her residence at the same time. They each ended up with one set of keys, which they later switched, at Janeway's request.

{¶ 14} At some point, Janeway saw Banks break her cell phone. She also testified that her home phone was broken. Upon her later return to her residence, she saw, on the floor, "my broken cell phone and my broken home phone on pieces on the ground."

{¶ 15} Outside the house, Banks insisted on a hug. Janeway testified that Banks then told her: "Do not tell your mother. Do not tell anybody. Do not call the police because you'll regret it."

{¶ 16} Banks drove away first. But Janeway did not simply go back into her house, because she did not know if Banks was still in the area. Janeway, who had no phone, drove to her mother's house, and called her friend, the same friend she had been talking to before Banks

broke in to her residence.   Her friend, who lived nearby, came to her mother's house, and drove her back to her house.   On the way, she called the police on her friend's phone.   Janeway left her son at her mother's house.

{¶ 17}   At the suggestion of the police, Janeway met with them at a Walgreens store. She identified a picture of Banks.   An officer then went with her to her residence.

## II.   The Course of Proceedings

{¶ 18}   Banks was arrested and charged by indictment with Aggravated Burglary, in violation of R.C. 2911.11(A)(1), a felony of the first degree, and Disrupting Public Services, in violation of R.C. 2909.04(A)(1), a felony of the fourth degree.

{¶ 19}   Banks moved to suppress statements he made to police.   Following a hearing, his motion to suppress was overruled.   Following a jury trial, Banks was found guilty of both offenses as charged.   The trial court imposed community control sanctions for both offenses.

{¶ 20}   From his conviction and sentence, Banks appeals.

## III.   The Trial Court Did Not Prevent Banks from Questioning the Police Officer who Asked him to Come to the Police Station for Questioning About the "Coercive Atmosphere" in the Circumstances Leading Up to and During his Interrogation

{¶ 21}   Banks's First Assignment of Error is as follows:

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN PRECLUDING APPELLANT FROM QUESTIONING OR EXPLORING WHETHER HE WAS SUBJECT TO

A COERCIVE ATMOSPHERE IN THE CIRCUMSTANCES LEADING UP TO AND DURING HIS INTERROGATION BUT HOLDING IN ITS DECISION AND LATER WHEN APPELLANT RENEWED THE MOTION HOLDING APPELLANT FAILED TO PRODUCE EVIDENCE BY NOT ASKING QUESTIONS.

**{¶ 22}** Banks cites *State v. Kerby*, 2d Dist. Clark No. 03-CA-55, 2007-Ohio-187, ¶ 43, for the proposition that:

The Fifth Amendment to the Constitution of the United States and Article 1, Section 10 of the Ohio Constitution provide that no individual shall be compelled to be a witness against himself or herself in any criminal case. An individual may waive this protection; however, waiver must be voluntary. In determining whether a suspect has voluntarily waived the privilege against self-incrimination, a court "should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards* (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051, at paragraph two of the syllabus, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155; *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, at ¶ 13.

**{¶ 23}** Banks argues that the trial court prevented him, at the suppression hearing, from questioning the State's witness about the "coercive atmosphere" leading up to and during his interrogation. In the argument section of his brief, Banks does not cite to the record to support this assertion, but he does cite the following colloquy in the statement of facts part of his brief:

Q. Fair enough. Now at the home, when you went to Mr. Banks' home,

how did you get entered into the house?

> A. How did I get entry into Mr. Banks' house?
>
> Q. How'd you go into the house, yes.
>
> MS. OLIVER [representing the State]: I'm going to object to that. That is not part of the motion to suppress that was filed. This is about the statements and the rights form and his contact [sic] on how he got into his house is completely irrelevant. This is not about arrest, this is not about collection of evidence; this is about statements.

{¶ 24} The State's objection was overruled. Banks's inquiry concerning the circumstances of the officer's entry into his house and the request to come to the police station for questioning then continued for three transcript pages, interrupted only briefly to clarify whether the person referred to in one question was Banks, or his brother, who was also present.

{¶ 25} The following colloquy then occurred:

> Q. I understand that. But at the same time, if he said, no, I don't want to come with you, was he – were you going to go out the door without him?
>
> A. That's a what-if question, sir.
>
> Q. Well what was your mindset, what was –
>
> MS. OLIVER: I'm going to object, based on speculation.
>
> THE COURT: Sustained. Sustained.

BY MR. SCACCIA [representing Banks]:

Q. You said that he was not under arrest, correct?

A. Correct. I did not put handcuffs on him when we left the house.

Q. However was he free to leave on his own accord and go in any direction he wanted to?

MS. OLIVER: I'm going to object, Your Honor, this is outside the scope of statements. This is a situation where the defense attorney is now going into an area of suppression based on arrest and that is not what has been filed in this case.

MR. SCACCIA: I am only following up on his questions – on his statements, Your Honor.

THE COURT: Okay. But, Mr. Scaccia, you are going outside of the boundaries that you set in your motion.

MR. SCACCIA: If he opens the door, I think I'm allowed to ask a question about it.

THE COURT: And he gave you an answer.

MR. SCACCIA: Well he didn't answer, really.

THE COURT: Mr. Scaccia.

MR. SCACCIA: All right. Note for the record, please.

{¶ 26} Banks then turned his attention to his interrogation at the police station, and was able to elicit from the witness that by the time of the interrogation, Banks was not free to leave.

{¶ 27} The only questions that Banks was not permitted to put to the witness, Huber Heights Police Detective Mike Noll, asked whether Banks would have been free to decline Noll's request to come to the police station for questioning, had Banks chosen to decline the request. Even if we were to disagree with the trial court's expressed reasoning for sustaining objections to these questions, we find no error on the part of the trial court. Detective Noll's intent to have insisted upon Banks accompanying Noll to the police station for questioning, if that was his

intent, would have been relevant to the issue of a coercive atmosphere only if that intent had been communicated to Banks.

{¶ 28}   Banks was permitted to, and did, question Noll at length concerning what Noll said and did before, during, and after Noll asked Banks to come with him to the police station for questioning.   In fact, Banks was permitted to, and did, elicit from Noll that by the time the interrogation commenced at the police station, Banks was not free to leave.

{¶ 29}   In his assignment of error, Banks also contends that the trial court erred by basing its decision on his motion to suppress, and later its decision, at trial, on his renewed motion to suppress, upon the fact that Banks had not asked questions at the suppression hearing.   In its decision overruling Banks's motion to suppress, the trial court simply found that the State had met its burden of establishing that Banks's waiver of his right to remain silent was voluntary. We find nothing in the trial court's decision holding it against Banks that he failed to question Detective Noll on the subject of whether Banks was free to have declined Noll's request to accompany Noll to the police station for questioning, which, of course, the trial court had disallowed.

{¶ 30}   At trial, Detective Noll's testimony included the following:

Q.   And did you make contact with the Defendant?

A.   I made contact with his brother, who then yelled back into the house, because Mr. Banks was back in the house doing something.   His brother let him know that we were there. And we stepped in and informed Mr. Banks why we were there.   And I asked him to come to the police department with us to talk about what had happened.

Q.   Did you give him the option not to come?

A.   I asked him if he would come with me.   At that point, I didn't give him –

MR. SCACCIA: Objection, Your Honor.   Well, I withdraw it.   I spoke too soon.

BY MS. OLIVER:

Q.   Go ahead.   You didn't give him what?

A.   I didn't give him a choice A or a choice B.   I just said, "Hey, will you come back to the police department and talk to us about this report that we're investigating.   I see that you know this female."   He voluntarily agreed to put on his shoes and come with us.

Q.   Okay.   And was he put in handcuffs at that time?

A.   No, he was not.

**{¶ 31}**   Shortly after this testimony, as the State was preparing to question Detective Noll about the *Miranda* rights form that had been marked as an exhibit, Banks requested a sidebar conference, and objected,[1] arguing that Detective Noll had testified at trial that Banks was under arrest at his house.   The State argued that Detective Noll's trial testimony was consistent with his testimony at the suppression hearing – that Banks was not free to leave once he was at the police station for questioning.

**{¶ 32}**   We agree with the State.   We find nothing in Detective Noll's trial testimony on this point that is inconsistent with his testimony at the suppression hearing.   Specifically, we find nothing in Detective Noll's trial testimony to indicate that Banks was under arrest at any time before his arrival at the police station.   Noll testified, in effect, that he neither informed Banks that he was free to decline to accompany Noll to the police station, nor that Banks was not free to decline the request.

**{¶ 33}**   To the extent that Banks was renewing, at sidebar, his motion to suppress the

---

[1]   From the record, it is not clear what Banks was objecting to.

statements he made at the police station, his motion was based on the argument that Detective Noll testified at trial that Banks was under arrest at his home, before he even got to the police station. We find no support in the record for this proposition of fact. And we reiterate that Detective Noll's subjective intent on the question of whether Banks would have been free to have declined Noll's request to come to the police station for questioning would have no relevance to the issue of coercive atmosphere unless that intent had been communicated, expressly or implicitly, to Banks. We have found no instance in the record of the suppression hearing where Banks was prevented from exploring what Noll said or did in Banks's presence.

{¶ 34} Banks's First Assignment of Error is overruled.

### IV. The Trial Court Did Not Err in Overruling Bank's Motion for a Judgment of Acquittal on the Disrupting Public Services Charge

{¶ 35} Banks's Second Assignment of Error is as follows:

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN NOT DISMISSING THE DISRUPTING PUBLIC SERVICES CHARGE (TR 363-87, TR 485-87) OR OTHERWISE NOT INSTRUCTING THAT THE CRIME REQUIRES EVIDENCE THAT THE PHONE IN QUESTION WAS BEING USED OR PURPOSELY PREVENTED FROM USE FOR EMERGENCY COMMUNICATION [(]TR 363-87).

{¶ 36} Banks was charged with violating R.C. 2909.04(A)(1), which provides:

No person, purposely by any means or knowingly by damaging or tampering with any property, shall do any of the following:

(1) Interrupt or impair television, radio, telephone, telegraph, or other mass

communications service; police, fire, or other public service communications; radar, loran, radio, or other electronic aids to air or marine navigation or communications; or amateur or citizens band radio communications being used for public service or emergency communications[.]

{¶ 37}   In *State v. Thomas*, 2d Dist. Montgomery No. 19435, 2003-Ohio-5746, ¶ 62, we held that: "The statute prohibits purposeful or knowing damaging or tampering with property that interrupts or impairs telephone service. Telephone service includes the initiation of telephone calls."

{¶ 38}   Banks asserts that to prove a violation of this statute, the State must prove either that the telephone damaged or tampered with was being used to contact emergency services, or was thereby being prevented from being used for that purpose.  Assuming that this is an essential element for the State to prove, there is evidence in this record from which a reasonable jury could find that Janeway's phones were damaged or tampered with to prevent her from using them to call the police.

{¶ 39}   Banks contends that the only reasonable view of the evidence is that he took Janeway's cell phone (later breaking it) and unplugged her home phone; i.e., disconnected it from the outside phone line, merely to prevent their conversation from being interrupted by someone calling Janeway.   The trial court, in overruling Banks's motion, seems to have accepted his view of the evidence that he merely unplugged Janeway's home phone.  But Janeway testified that when she returned to her home, after she and Banks left it, she found her home phone in pieces on her floor.

{¶ 40}   In any event, Janeway testified that when she and Banks were outside her home, before they each drove away, he said to her:  "Do not call the police because you'll regret it." From Banks's having discouraged Janeway from calling the police, a reasonable finder of fact could infer that his purpose in breaking her cell phone, and either breaking, or at least

unplugging, her home phone, was to prevent her from contacting the police.

{¶ 41} Banks also contends that there was error in the jury instructions regarding the Disrupting Public Services charge, but any error in this regard was not preserved. After the trial court had instructed the jury, it asked both counsel for any suggested corrections or additions. With one exception not material to this issue, neither counsel had any suggestions. The instruction given to the jury on the Disrupting Public Services charge used the words of the statute.

{¶ 42} Banks's Second Assignment of Error is overruled.

### V. The Trial Court Did Not Err in Overruling Banks's Motion
### for a Judgment of Acquittal on the Aggravated Burglary Charge

{¶ 43} Banks's Third Assignment of Error is as follows:

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY NOT DISMISSING THE AGGREVATED [sic] BURGLARY CHARGE BUT INSTEAD SUGGESTING AND THEN PERMITTING AMENDMENT OF THE CHARGE AT THE END OF THE PROSECUTION'S CASE IN CHIEF WITHOUT PRIOR NOTICE (TR 363-87) OR OTHER OPPORTUNITY TO MINIMIZE THE PREJUDICIAL IMPACT IN VIOLATION OF FIFTH AMENDMENT AND DUE PROCESS RIGHTS.

{¶ 44} The indictment charged that Banks:

* * * by force, stealth or deception, did trespass in an occupied structure, to-wit: **RESIDENCE** located at [Janeway's address] or in a separately secured or separately occupied portion of the occupied structure, when another person, other than an accomplice of the offender,

was present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure, any criminal offense, to wit: **ASSAULT**, and did recklessly inflict, or attempt or threaten to inflict physical harm on another, to-wit: **TIFFANY N. JANEWAY**; contrary to the form of the statute (in violation of Section 2911.11(A)(1) of the Ohio Revised Code) in such case made and provided, and against the peace and dignity of the State of Ohio. (Bolding in original.)

{¶ 45} In arguing his motion, Banks contended that there was no proof that he intended to commit an assault upon Janeway, or, for that matter, any other crime, when he was trespassing in her home. The trial court disagreed, citing Janeway's testimony that Banks pushed her backwards onto the desk in her daughter's room, causing her pain and breaking items on the desk, and then placed his hands on the top of her chest, just below her neck. The trial court also cited Janeway's testimony that Banks appeared to be very angry at her, as supporting an inference that he meant to cause her physical harm.

{¶ 46} Banks then noted that the indictment included the word "recklessly," and that to be guilty of Assault one must either knowingly cause or attempt to cause physical harm, R.C. 2903.13(A), or recklessly cause serious physical harm, R.C. 2903.13(B). Thus, according to Banks, the State had to prove that he had caused serious physical harm, which Banks argued the State had not proved.

{¶ 47} Here, Banks is confusing that part of the indictment specifying the underlying offense, Assault, with that part of the indictment alleging the facts that distinguish Aggravated Burglary from Burglary. Unlike Burglary, a conviction for Aggravated Burglary requires proof that the offender inflicted, or attempted or threatened to inflict, physical harm on another. R.C.

2911.11(A)(1). The physical harm required for Aggravated Burglary under Division (A)(1) of the statute does not need to be serious.

{¶ 48} The word "recklessly" in the indictment is not used in connection with the indictment's reference to Assault as the crime that Banks intended to commit, but in connection with the facts needed to be proved to elevate Burglary to Aggravated Burglary. Thus, Banks's argument that the State was required, but failed, to prove serious physical harm to Janeway is without merit.

{¶ 49} The trial court did not err when it overruled Banks's Crim.R. 29 motion for a judgment of acquittal on the Aggravated Burglary charge.

## VI. The Trial Court Did Not Commit Plain Error when it Permitted the State to Amend the Aggravated Burglary Count in the Indictment

{¶ 50} In the second part of Banks's Third Assignment of Error, Banks predicates reversible error upon the trial court's having permitted the State, after its case in chief, to amend the Aggravated Burglary count in the indictment to delete "Assault" as the crime that Banks allegedly intended to commit while trespassing in Janeway's home. Banks did object to the amendment, and one might think that this was sufficient to preserve any error in the amendment for appellate review – that it was not necessary to object to the jury instructions, since the question of whether the jury instructions correctly instruct the jury concerning the offense alleged in the amended indictment is analytically distinct from the question of whether the indictment should have been amended. In other words, if an indictment is amended from Rape to Kidnapping, one would expect the charging conference to center upon whether the jury is being

correctly instructed concerning the elements of Kidnapping.

{¶ 51} But in a similar case, the Supreme Court of Ohio has held that even when a defendant objects to the amendment of an Aggravated Burglary indictment, his failure to object to the jury instructions on that charge constitutes a failure to preserve the issue for appellate review, so that the issue is governed by the plain-error standard of review. *State v. Lynn*, 129 Ohio St.3d, 146, 2011-Ohio-2722, 950 N.E.2d 931, ¶ 12. Banks did not object to the jury instructions as given by the trial court, which omitted reference to any specific crime that Banks was alleged to have intended to commit while trespassing in Janeway's home.

{¶ 52} As did the defendant in *Lynn*, Banks received a discovery packet early in the process, about seven months before trial. As in *Lynn*, "the jury instructions given by the trial court did not result in fundamental unfairness to [the defendant]." *Id.*, ¶ 15. The State argued both that Banks intended to assault Janeway, and that he intended to interfere with her ability to contact the police; i.e., that he intended to commit the offense of Disrupting Public Services. Neither theory could have come as much of a surprise to Banks. The original indictment had alleged Assault as the underlying crime, and the indictment also included Disrupting Public Services as its second count.

{¶ 53} The jury was not instructed on the elements of Assault, which was one of the two underlying crimes that the State claimed Banks intended to commit. It was, of course, instructed concerning the elements of Disrupting Public Services, since that was a separate offense alleged in the indictment. The Supreme Court of Ohio has held that "the trial court [is] not required to instruct the jury on the elements of any underlying offense." *Id*., ¶ 16.

{¶ 54} In *Lynn*, the Supreme Court did observe that: "Although a trial court is not

required to instruct on the elements of the underlying offense that a defendant intends to commit while trespassing in an occupied structure, this court has previously expressed a preference that the trial court do so." *Id.*, ¶ 17. We agree. Without those instructions, the jury is left to speculate whether a defendant's actual and intended conduct while trespassing in an occupied structure, which may perhaps have been morally repugnant, actually constitutes a crime under the Ohio criminal code.

**{¶ 55}** Nevertheless, under *Lynn*, the trial court's failure to have instructed the jury on the elements of Assault does not constitute error, and cannot, therefore, have constituted plain error.

**{¶ 56}** Banks's Third Assignment of Error is overruled.

## VII. Conclusion

**{¶ 57}** All of Banks's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

FROELICH, P.J., and HALL, J., concur.

Copies mailed to:

Mathias H. Heck
Michele D. Phipps
John J. Scaccia
Hon. Frances E. McGee