FILED

03/25/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 3, 2023 Session

**STATE OF TENNESSEE v. ANTONIO DEMETRIUS ADKISSON A/K/A
ANTONIO DEMETRIUS TURNER JR.**

**Appeal from the Circuit Court for Gibson County
No. 19840     Clayburn Peeples, Judge**

————————————————————

**No. W2022-01009-CCA-R3-CD**

————————————————————

CAMILLE R. MCMULLEN, P.J., dissenting.

Police officers in this case obtained a confession from a juvenile by threatening him with the death penalty, repeatedly denying his requests for his mother who was present at the station, and interrogating him for over six hours in the middle of the night. After reviewing the totality of the circumstances, I would have concluded that the trial court erred in denying the Defendant's motion to suppress because the Defendant's Miranda waiver was invalid and his confession was involuntary. I also would have concluded that the juvenile court erred in finding probable cause that the Defendant committed the offenses. Therefore, I must respectfully dissent.

**I. Juvenile Transfer**. The juvenile court found probable cause that the Defendant committed two counts of first degree murder based on the following facts presented at the transfer hearing: (1) the Defendant was at the Meadows with the co-defendant two hours before the shooting; (2) the co-defendant interacted with one of the victims and displayed a gun; (3) a witness saw the Defendant and the co-defendant speed walking or running through "the cut" after the shooting; and (4) the victims were shot with two different guns. These facts amount to mere suspicion rather than probable cause.

Appellate review of a lawyer juvenile judge's order transferring a child to be tried as an adult is "awkward" because it occurs only *after* there has been a final judgment in the case. State v. Griffin, 914 S.W.2d 564, 566 (Tenn. Crim. App. 1995). In other words, if the juvenile court erred in transferring jurisdiction to the trial court, then appellate review of the issue is held in abeyance until the case is concluded on the merits. This is particularly problematic where, as in this case, a defendant contends that there were insufficient findings of fact in support of probable cause that he committed the offense. If the Defendant's contention is true, then the State lacked the ability to charge him as an adult,

the jury lacked the authority to consider his guilt, and the trial court lacked the jurisdiction to impose a sentence.

At issue in this case is Tennessee Code Annotated Section 37-1-134(a)(4)(A), which requires that the juvenile court find probable cause to believe that the child committed the delinquent act before transferring that child to criminal court. Probable cause in the context of juvenile transfer hearings is not statutorily defined. In the context of an arrest, probable cause exists when the facts and circumstances and reliable information known to the officer at the time of arrest were "'sufficient to warrant a prudent [person] in believing that the [individual] had committed or was committing an offense.'" State v. Lawrence, 154 S.W.3d 71, 75-76 (Tenn. 2005) (quoting State v. Bridges, 963 S.W.2d 487, 491 (Tenn. 1997)). "[T]he probable[-]cause standard is ... practical, nontechnical, and focuses upon the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." State v. Reynolds, 504 S.W.3d 283, 300-01 (Tenn. 2016) (internal citations and quotations omitted). "[T]he strength of the evidence necessary to establish probable cause to arrest is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt." State v. Bishop, 431 S.W.3d 22, 41 (Tenn. 2014); see also Adams v. Williams, 407 U.S. 143, 149 (1972) ("Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."). Finally, probable cause must be more than a mere suspicion, but less than absolute certainty. Reynolds, 504 S.W.3d at 300.

Giving deference to the factual findings of the juvenile court, I am unable to conclude that the Defendant was properly transferred to be tried as an adult. It bears mentioning that the juvenile court *suppressed* the Defendant's statement and did not consider it at the juvenile transfer hearing. The remaining evidence presented at the transfer hearing does not establish probable cause that the Defendant committed two counts of first-degree murder. First, the State presented no evidence tending to show that the Defendant intended to kill the victims or engaged in premeditation. See Tenn. Code Ann. § 39-13-202(a)(1) (first degree murder is a "premeditated and intentional killing of another"). More importantly, the State presented no evidence from which a reasonable person could infer the Defendant's identity as the shooter, or that the Defendant was even at the scene of the shooting at the time of the offense. See State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)) ("The identity of the perpetrator is an essential element of any crime."). The testimony that the Defendant was speed walking or running through "the cut" on the night of the offense established only that he was in the vicinity of the shooting after it occurred. But this activity, standing alone, amounts to mere suspicion and not probable cause.

It is significant to my conclusion that the juvenile court heard testimony regarding the co-defendant and the Defendant at the same time. When describing the testimony supporting a finding of probable cause, the juvenile court mentioned the co-defendant

individually no less than five times, and only mentioned the Defendant in joint references to "the defendants." While there was testimony that earlier that night the co-defendant had a verbal exchange with a group that included one of the victims, and that the co-defendant displayed a gun, no such testimony was offered against the Defendant. This is problematic because "probable cause to arrest and/or search an individual must be particularized to that individual" and "mere proximity to criminal activity alone is insufficient[.]" See, e.g., Whitehead v. Commonwealth, 683 S.E.2d 299, 313 (Va. 2009). Given the lack of proof particularized to the Defendant, the juvenile court erred in finding probable cause that the Defendant committed the offenses. This error means that the trial court lacked jurisdiction to convict and sentence the Defendant. Accordingly, I would have reversed the judgments of the trial court.

**II. Motion to Suppress**. The trial court admitted a confession obtained: (1) from a juvenile with no prior experience with the police; (2) after over six hours of interrogation in the middle of the night; and (3) after he was improperly threatened with the death penalty and repeatedly denied access to his mother. The totality of the circumstances demonstrates that the Defendant's Miranda waiver was invalid and his confession was involuntary.

Body camera footage shows officers arriving at the Defendant's home at around 2:00 a.m. the night of the shooting. One of the officers asks the Defendant where he had been that night. The Defendant looks at his mother, who says, "you don't have to explain that." The Defendant says he was at the Meadows around 7:00 p.m. Sergeant Joe Fountain tells the Defendant he is not under arrest, but provides verbal Miranda warnings. Sergeant Fountain asks if the Defendant understands. The Defendant appears to nod affirmatively, but his mother quickly interjects and asks why he is being advised of his rights and questioned if he is not under arrest. Sergeant Fountain tells the Defendant's mother that Investigator Jason Williams will explain "in just a minute." Investigator Williams arrives and asks the Defendant if he has seen the co-defendant. The Defendant says he was with him earlier. Investigator Williams says he is going to take the Defendant to the police station to talk and will bring him home when they are done. When the Defendant's mother asks if she can come, he says she is "more than welcome." She asks again what is going on, and Investigator Williams says there was a double homicide and that the Defendant "knows something." The Defendant's step-father asks Investigator Williams if the Defendant's mother can be present while they question the Defendant since he is seventeen, and Investigator Williams says she can. Officers take the Defendant to a patrol car, and the Defendant's mother tells the Defendant she is right behind him.

The recording of the interrogation begins at 2:21 a.m. The Defendant is seated in the interrogation room with the door open and two officers are standing in the doorway. Around 2:24 a.m., officers can be heard saying, "This is mother. She is welcome back." Another officer then says, "Hold off on that. Hold up." At 2:30 a.m., Officer Nick Glenn, the resource officer at the Defendant's school, enters the interrogation room. The Defendant tells Officer Glenn he was at the Meadows earlier in the day, but he did not see

anyone get shot. He saw one of the victims, with whom he previously had an altercation, and the victim's friends at the Meadows. The victim and his friends lifted their shirts to show the guns in their waistbands.

At 2:39 a.m., Investigator Williams enters the room and Officer Glenn leaves. After asking some background questions, Investigator Williams asks the Defendant if he wants to go over his rights again. The Defendant shakes his head negatively. Investigator Williams reads his rights anyway, in a rapid but coherent fashion. He adds to the end of the rights that "whereas anything we discuss right now, I can talk to the [district attorney] about in the future." Investigator Williams immediately tells the Defendant, "I probably got enough to charge you with two counts of first degree murder." He then says:

> But, first of all, before we get that far. I heard some of the conversation you had with [Officer Glenn]. . . . And evidently, you've had some beef with these guys. If you're scared of them or if they, you know if you [were] in fear for your life, or if you and [the co-defendant] were in fear for your lives . . . Now, right now is the time to tell me the truth. Because if you don't . . . I don't know if you realize how much trouble that ya'll are in. Okay? I mean, you're looking at possibly the death penalty.

He tells the Defendant if he is honest with him, he will help him as much as he can. The Defendant repeats the same things he told Officer Glenn. Investigator Williams responds, "I would believe that if I didn't see you on video. The Meadows has got video. Marshall Gardens has got video pointing towards the shooting." No such video existed. Still, the Defendant denies being there or shooting anyone.

At 2:51 a.m., Investigator Williams says he does not believe the Defendant and asks him if he has ever taken a polygraph test. The Defendant says he does not know what that is, and Investigator Williams explains it is a lie detector test. The Defendant says he has never taken one, and Investigator Williams asks if he would take it. Though the transcript indicates that the Defendant responds, "I'll take one," it sounds like the Defendant actually says, "Ask my mamma." Investigator Williams tells the Defendant that he would fail the polygraph test. Investigator Williams says numerous people told him the Defendant and the co-defendant were there at the time of the shooting. The Defendant again denies any involvement.

At 2:52 a.m., Investigator Williams asks the Defendant who shot the victims if it was not him. The Defendant replies, "I don't know who shot . . . Can you get my mamma in here?" Investigator Williams responds, "No, I'm not getting your mamma in here. I mean this is grown up shit you know what I'm saying?" The Defendant slumps his head down and pauses. Investigator Williams says, "You want me to run with this?" The Defendant responds, "You said everybody saw me?" He again denies being involved in the shooting. He says he was with his father when the shooting occurred. Investigator

Williams says he is going to get his father's phone records to determine if they would "ping" at the location where the Defendant said he was.

At 2:57 a.m., Investigator Williams tells the Defendant, "You ain't going nowhere. . . . The first lie that I prove, I'm gonna charge you with two counts of first degree murder. So if you want to start over and tell me the damn truth, we'll deal with it." At 3:00 a.m., the Defendant admits to being at the Meadows when the shooting occurred. He says he and the co-defendant heard gunshots and ran because they did not want to get shot. Investigator Williams insists that "all of that is bullshit" and either the Defendant or the co-defendant pulled the trigger. The Defendant denies that they were involved in the shooting.

At 3:07 a.m., Investigator Williams says the Defendant is lying and asks whether it was him or the co-defendant that pulled the trigger. The Defendant says it was the co-defendant, but he was with him. The Defendant explains that the co-defendant shot after the other group pulled out a gun, and the Defendant ran away out of fear. Investigator Williams draws a map of the Meadows, and the Defendant shows him where he and the co-defendant were standing when the shooting occurred. Investigator Williams says, "I believe everything you're telling me, but I don't believe you're putting yourself where you need to be." The Defendant asks, "Where was I at?" and Investigator Williams points to another location, presumably where the victims were found, and asks the Defendant if he was there instead. The Defendant denied being at that location, and Investigator Williams asks, "Well, if what you're telling is true . . . How is my guys right here dead?"

At 3:19 a.m., Investigator Williams asks the Defendant, "And if I test your hands right now, there won't be no gunshot residue on them?" The Defendant responds, "Right." Investigator Williams gets up to leave, and the following exchange occurs:

> [Defendant:]  Is my mamma here?
>
> [Investigator Williams:]  She is.  I'll talk to her too.  Okay?
>
> [Defendant:]  Can I talk to her?
>
> [Investigator Williams:]  Yea.  We'll let you talk to her in just a second.

Investigator Williams leaves. The Defendant crosses his arms, places them on the table, and lays his head down on his arms.

At 3:23 a.m., Chief Bobby Sellers enters the room and tells the Defendant he is the police chief. The following exchange occurs:

> [Chief Sellers:]  . . . Do you understand how much trouble you're in?

| [Defendant:] | Because I was with him when it happened? |
| [Chief Sellers:] | [nods affirmatively] |
| [Defendant:] | [nods affirmatively] |
| [Chief Sellers:] | You're just as guilty as he is. |
| [Defendant:] | I didn't know he was going to do it though. |
| [Chief Sellers:] | I understand. But do you think twelve men and women in a jury box are gonna believe that? |
| [Defendant:] | [shrugs his shoulders] |

Chief Sellers tells the Defendant that he "needs to start thinking about helping himself." The Defendant says that is why he told them the truth, and he only lied initially to protect the co-defendant. Shortly after, Chief Sellers says, "You know what they do to seventeen-year-olds in the [penitentiary]?" The Defendant shakes his head no, and Chief Sellers says, "I don't think you want to know." The Defendant responds, "And [Investigator Williams] said I might get the death penalty." Chief Sellers says, "I don't know about that. We don't know about that. But you're in a lot of damn trouble. What you've got to do right now is help yourself. Where is [the co-defendant] at?" The Defendant says he does not know. Chief Sellers leaves at 3:27 a.m. The Defendant places his head in his hands, tightly grips his hair, and rocks back and forth in his chair. He then puts his head down and taps it repeatedly on the table.

Investigator Williams returns at 3:45 a.m. They go back over the shooting, and Investigator Williams says he does not believe that the Defendant "bailed on his homeboy" and stayed by the dumpsters, which were approximately forty yards away from the shooting, when the co-defendant approached the victims. At 3:54 a.m., the Defendant tells Investigator Williams that Chief Sellers told him even though he was not the shooter, he can still get in trouble for being there and the jury will probably not believe that he was not involved. At 3:57 a.m., Investigator Williams says he believes the Defendant that he was not the shooter, but the Defendant was right there with the co-defendant and he is "on the verge of proving that." The Defendant maintains he stayed by the dumpsters. Investigator Williams insists that does not make sense and that "shows how cooperative" the Defendant is being. The Defendant asks if he means he is "being bad or good cooperating" and Investigator Williams tells him he is in the middle. Investigator Williams tells the Defendant he has to be truthful if he wants his help.

At 4:01 a.m., Investigator Williams gets up to leave. The Defendant tells Investigator Williams he has a question. The recording, however, jumps forward ten seconds to the Defendant saying, "they not gonna believe that?"[1] Investigator Williams accuses the Defendant and the co-defendant of being in a gang and says there is "no way in the world" that he stayed back while the co-defendant walked up to three rival gang members. Investigator Williams tells the Defendant that if he wants him to "whisper in [the district attorney's] ear" that the Defendant was cooperative, scared, remorseful, and just a kid, he needs to tell the truth. At 4:03 a.m., Investigator Williams begins leaving and the Defendant says, "Is my. . . You said I could talk to my mamma." Investigator Williams responds, "Yea, I think they're talking to her. But we'll get her in a minute." The Defendant slumps his head down. Investigator Williams leaves, and the Defendant lays his head in his lap. At 4:05 a.m., an officer opens the door and asks the Defendant if he wants a biscuit. The Defendant asks for water, and the officer brings him a bottle of water.

At 4:31 a.m., Investigator Williams and Detective Kelvin Whitney enter the room. Investigator Williams insists that the Defendant was right beside the co-defendant during the shooting, but the Defendant maintains that he stayed back. Investigator Williams tells the Defendant that they are about to pick up the co-defendant, and the co-defendant is going to "put this on [the Defendant]." At 4:35 a.m., Investigator Williams says the Defendant saw the co-defendant shoot and "was up there with him." The Defendant says he was up there when the co-defendant shot. When questioned further, he says he did not see the co-defendant pull out the gun and shoot, he just heard gunshots. On the map Investigator Williams drew, he shows the Defendant where the shell casings and victims were found. He says there is no way the Defendant was that close and did not see the gunshots. He insists that the Defendant is lying and will have to "answer for it." The Defendant says, "What? Take this charge?" Investigator Williams says that is what is going to happen, and the Defendant insists he was not the shooter. Investigator Williams describes in detail what he thinks happened. When he says the Defendant saw the co-defendant pull his pistol out and start shooting, the Defendant responds, "Yes sir." Detective Whitney asks the Defendant which way he ran, and the Defendant looks at Investigator Williams and says, "Can you show him?" Investigator Williams flips in his notebook to the previously drawn map. The Defendant points to where he was, and Investigator Williams says, "no, right here" and points to a different spot. The Defendant says he was referring to where they started. When the Defendant shows the path he ran after the shooting, Investigator Williams says the Defendant is confused and tells him he ran a different way. At 4:47 a.m., Investigator Williams and Detective Whitney leave. The Defendant says under his breath that he is about to go jail. The Defendant lays his head on the table.

---

[1] The recording repeatedly jumps forward in time throughout the interrogation, sometimes ten seconds and sometimes five minutes. This appears to be the only time where any conversation is cut. The other times, the Defendant is alone.

At 5:06 a.m., an officer comes in briefly to ask the Defendant what clothes he was wearing during the shooting. At 5:48 a.m., after sitting alone for approximately forty minutes, the Defendant knocks on the door. An officer comes a couple of minutes later. The Defendant asks to use the restroom and is permitted to do so. The Defendant quickly returns.

At 6:00 a.m., Detective Whitney returns. He asks where the Defendant's gun is, and the Defendant denies having a gun. Detective Whitney says that is "not matching up." He says there were "two different guns out there," and the Defendant responds "okay." Detective Whitney asks what he did with the other gun, and the Defendant maintains that he did not have a gun. Detective Whitney asks if the gunshot residue test is going to show that he fired a gun. The Defendant says no, and that he thought Investigator Williams went to get the test. Detective Whitney responds, "So you didn't have a revolver or nothing?" The Defendant says no, and Detective Whitney asks, "Then where's the rest of the shell casings at then?" The Defendant says he does not know. Detective Whitney again asks if the gunshot residue test will show that he shot a weapon, and the Defendant says no. At 6:02 a.m., Detective Whitney gets up to leave, and the Defendant asks if he is going to get the gunshot residue test. Detective Whitney responds, "In just a minute, yep." Detective Whitney leaves the room. The Defendant immediately gets up and knocks on the door. Detective Whitney opens the door, and the Defendant asks, "Can I talk to my mamma? Is she still here?" Detective Whitney responds, "Yea. You can talk to her in a minute." At 6:22 a.m., while alone in the room, the Defendant says under his breath, "I'm fighting for my life because of [the co-defendant]. F*** [the co-defendant]." At 6:39 a.m., the Defendant knocks on the door and asks for a blanket or towel because he is cold. An officer says they do not have any.

At 6:55 a.m., the Defendant knocks on the door. Two officers open the door, and the Defendant asks if he can talk to Detective Whitney. At 6:57 a.m., Detective Whitney returns. As soon as Detective Whitney sits down, the Defendant says, "I'm scared." Detective Whitney says he has known the Defendant for a long time and the Defendant needs to "spill the beans" and come "completely clean." The Defendant promises that he has told them everything. Detective Whitney asks what he is scared of, and the Defendant says he is scared that if the officers cannot get to [the co-defendant], they are going to "come to [him]." Detective Whitney asks the Defendant if there is anything else, and the Defendant says that the co-defendant had two guns. Detective Whitney asks if the co-defendant had an automatic and a revolver, and the Defendant says yes. The Defendant denies holding either of the guns and says he is ready to take a gunshot residue test. Detective Whitney tells the Defendant to knock on the door if he thinks of anything else. As Detective Whitney is leaving, the Defendant asks if he "has to stay here still" after he takes the gunshot residue test. Detective Whitney responds, "I don't know man. We're still trying to figure everything out." The Defendant hangs his head. Detective Whitney leaves at 7:02 a.m. The Defendant puts his head down on the table. Though his face is not visible, it sounds like he is crying. He whispers, "I'm scared." He blows his nose in a

napkin and wipes his eyes.  At 7:07 a.m., he turns sideways in his chair, lays his head on the back of the chair, and tries to sleep.  After seven minutes, he lays his head on the table for a couple minutes, then stands up.

At 7:26 a.m., the Defendant knocks on the door and no one comes.  At 7:44 a.m., the Defendant knocks on the door again and an officer comes.  The Defendant asks to use the restroom and is permitted to do so.  The Defendant quickly returns.  At 8:08 a.m., an officer brings the Defendant McDonald's, which the Defendant does not eat.

At 8:34 a.m., Detective Whitney returns.  He tells the Defendant they are about to "run a search warrant" on the Defendant's home and talk to his father and "some other people."  The following exchange occurs:

| | |
|---|---|
| [Detective Whitney:] | . . . [D]ude, we know you had a gun. |
| [Defendant:] | Did you – |
| [Detective Whitney:] | Now the question is . . . Did you shoot out of fear?  Or did you shoot to kill somebody? |
| [Defendant:] | Cause I was scared. |
| [Detective Whitney:] | Okay. |
| [Defendant:] | I was scared. |

Detective Whitney asks whether the Defendant had the revolver or ten-millimeter.  The Defendant says he had the revolver.  He says the co-defendant gave him the revolver after the initial altercation to protect himself.  He says someone pulled out a gun, and he shot because he "felt like it was [his] life or their life."  Detective Whitney tells the Defendant, "I'm gonna come back in here again, and if I find out you lied to me this time about anything . . . it's gonna be bad dude."  He leaves the room at 8:38 a.m.  At 8:39 a.m., the Defendant knocks on the door and asks for Detective Whitney.  He tells Detective Whitney that there were four other people with the two victims.  Detective Whitney asks, "Is that it?"  The Defendant says he is trying to think, and Detective Whitney tells him to knock on the door if he thinks of anything else.  At 8:42 a.m., the Defendant knocks on the door again.  When Detective Whitney returns, the Defendant tells him he wants to start all the way over.  He explains the events prior to the shooting and repeats that the co-defendant gave him the gun and he shot after one of the men pointed a gun at him.  Detective Whitney leaves the room at 8:51 a.m.  At 9:31 a.m., an officer opens the door and asks the Defendant if he needs anything.  The Defendant says no and asks to talk to Detective Whitney.  The recording ends at 9:38 a.m., with the Defendant still alone in the room.  Neither the recording nor the transcript reflect that the Defendant was ever permitted to see his mother.

- 9 -

The Defendant filed a motion to suppress his confession in the juvenile court and the trial court. The juvenile court suppressed the confession, but the trial court did not. Though the trial court touched upon the Callahan factors, it did not engage in a meaningful weighing analysis at the suppression hearing or in its order denying relief. See State v. Callahan, 979 S.W.2d 577, 583 (Tenn. 1998). At the suppression hearing, after wrestling with the coercive effect, if any, of the discussion about a gunshot residue and polygraph test, the threat of the death penalty, and the absence of a parent, the trial court simply stated, "based upon the totality of the circumstances" the Defendant's confession was voluntary. In its order, the court explained its reasoning for denying relief in one paragraph, quoted in the majority opinion. This analysis falls woefully short of the "special care in scrutinizing purported waivers by juvenile suspects" that our law requires. See id.

**A. Miranda Waiver**. In an attempt to insulate constitutional error, the majority, *sua sponte*, posits that Miranda warnings were not necessary in this case because "the defendant was not under arrest or in custody at the time he spoke with officers and ultimately confessed." However, neither party disputes that the Defendant was in custody at the time of his statement, and rightfully so. See, e.g., State v. Dailey, 273 S.W.3d 94, 102-04 (Tenn. 2009) (holding that a defendant who drove himself to the police station, agreed to speak with officers, and was not handcuffed was in custody because he was subject to accusatory questioning in a small interrogation room with the door closed, and an officer told him he had enough to charge him with first degree murder); State v. Payne, 149 S.W.3d 20, 33-35 (Tenn. 2004) (holding that questioning of defendant who agreed to talk to police, drove himself to the station, and was not handcuffed became custodial when the officer's tone became accusatory, the officer denied the defendant's requests to speak with his sister, and the defendant was unable to open the door). Here, the record clearly shows multiple law enforcement officers came to the Defendant's home in the middle of the night, told him they were taking him to the police station, drove him to the police station in a patrol car, and interrogated him for over six hours. Upon entering the interrogation room, Investigator Williams immediately told the Defendant, "I probably got enough to charge you with two counts of first degree murder." Investigator Williams testified at the juvenile transfer hearing that when he denied the Defendant's request to talk to his mother within the first thirty minutes of the interrogation, the Defendant was not free to go. Throughout the six-and-a-half-hour interrogation, the Defendant requested to speak with his mother four times but was not permitted to do so. Based on these facts, no credible argument can be made that the Defendant was not in custody for Miranda purposes at the time of his statement. Accordingly, the relevant question, as raised by the parties, is the validity of the Defendant's Miranda waiver under the circumstances. After analyzing the totality of the circumstances using the Callahan factors, I would have concluded that the trial court erred in finding that the Defendant's waiver was valid. See 979 S.W.2d at 583.

Factor one, the circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence, weighs against the validity of the waiver. As

- 10 -

the majority notes, the Defendant was seventeen-years-old, in the twelfth grade, and appeared intelligent to the trial court. The majority, however, failed to consider additional relevant circumstances surrounding the waiver. See State v. McKinney, 669 S.W.3d 753, 769 (Tenn. 2023) (considering not just the juvenile's age, experience, education, and intelligence, but also the juvenile's opportunity to consult with his mother, the manner in which his rights were explained, the detective's misleading statements, and the juvenile's signing of a waiver form).

The Defendant was provided verbal Miranda warnings twice—first at his home, and then at the police station. Both times, the Defendant's waiver was implicit. Neither officer asked the Defendant whether he wished to waive his rights, nor did they present him with a rights waiver form. Neither officer provided any further explanation of any of the rights. The Defendant did not ask any questions, though the officers did not ask if he had questions and arguably did not provide him an opportunity to ask questions because they immediately shifted to a different discussion after reading his rights.

When the first Miranda warnings were provided at his home, the Defendant's mother was present, but the Defendant was not permitted to consult with her privately. After Sergeant Fountain read the Defendant his rights, he asked if the Defendant understood. The Defendant appeared to nod affirmatively, but his mother quickly interjected and asked why he was being advised of his rights and questioned if he was not under arrest. When Investigator Williams arrived and said he was going to take the Defendant to the police station, the Defendant's mother asked if she could come. Investigator Williams twice assured her that she could be present for the interrogation. Because of these assurances, the Defendant's mother acquiesced and followed the Defendant to the police station. The Defendant's waiver of his Miranda rights and participation in the interrogation, in my view, was conditioned upon his mother being present. His mother, however, cannot be held to account for not terminating the interview, as relied upon by the majority, when she was prevented from entering the interrogation room or speaking with him despite his repeated requests.

When the second Miranda warnings were provided, the Defendant was alone in the interrogation room with Investigator Williams. Investigator Williams asked the Defendant if he wanted to go over his rights again, and the Defendant shook his head negatively. Investigator Williams read his rights anyway, in a rapid but coherent fashion. Investigator Williams added to the end of the rights that "whereas anything we discuss right now, I can talk to the [district attorney] about in the future." Immediately after, he told the Defendant that he probably had enough to charge him with two counts of first degree murder and the Defendant was "looking at possibly the death penalty." He said if the Defendant was honest, he would help him as much as he could.

I disagree with the factual characterization by the majority that though "Investigator Williams incorrectly stated the law in regard to minors being eligible for the death penalty,"

- 11 -

this statement "was later corrected in front of the defendant by the chief of police[.]"  The recorded interrogation, as fully detailed above, shows no such correction.  Chief Sellers was in the interrogation room for a total of four minutes.  In those four minutes, the Defendant told him that Investigator Williams said he might get the death penalty.  Instead of correcting the misstatement, Chief Sellers said, "I don't know about that.  We don't know about that.  But you're in a lot of damn trouble.  What you've got to do right now is help yourself.  Where is [the co-defendant] at?"

Because the majority relies on this misinformation in affirming the Defendant's conviction, it bears some explanation.  The incorrect idea that the misstatement was corrected originated with the following exchange at the juvenile court transfer hearing:

| [State:] | After watching the statement – or when you were in a closed circuit, did you see the Chief come in and explain to [the Defendant] that he couldn't get the death penalty? |
|---|---|
| [Investigator Williams:] | I did see the Chief come in, but – I guess he did.  Yeah. |

After the Defendant was transferred to the trial court, the State said in its response to the Defendant's motion to suppress that Chief Sellers "corrected" Investigator Williams' misstatement and "made the Defendant aware that he was not facing the death penalty."  At the suppression hearing, however, the trial court asked about the correction and the State clarified that "[t]he Chief came in later and told [the Defendant] that he – that this – he didn't know whether this was a death penalty case or not."  On appeal, the State rightfully abandoned its argument that the threat of the death penalty was corrected.  Still, the majority uses this "correction" to support its conclusion that the threat of the death penalty was not coercive.

Based on my research, the only two appellate courts to address the admissibility of a juvenile's confession made after officers incorrectly told him he might receive the death penalty found the confession inadmissible.  State v. Kerby, 2d Dist. Clark No. 03-CA-55, 2007-Ohio-187, ¶ 87; People v. McClary, 571 P.2d 620, 626-27 (Cal. 1977) (denial of requests for attorney and threat of death penalty rendered sixteen-year-old's confession involuntary).  In Kerby, officers told a seventeen-year-old with no prior experience with police that he was facing a capital case and implied that he needed to confess and show remorse to avoid the death penalty.  2007-Ohio-187, ¶ 87.  Though the juvenile was mature and only interrogated for approximately one hour, the court found that the officers' "[attempt] to create the impression that [the juvenile] could be facing a death sentence unless he cooperated with them and confessed" deprived the juvenile of his capacity to intelligently and voluntarily waive his Miranda rights.  Id.

- 12 -

Similar to Kerby, the officers in this case attempted to create the impression that the Defendant could receive a death sentence if he did not cooperate and confess. See 2007-Ohio-187, ¶ 87. As the trial court noted during the suppression hearing, "the implication [was] that '[t]his is a death penalty case unless you tell me about it, [then] maybe I can help you get out of the death penalty.'" In other words, Investigator Williams suggested to the Defendant that the consequence of exercising his right to remain silent might be death, despite the fact that juveniles are not eligible for the death penalty. See Roper v. Simmons, 543 U.S. 551, 578 (2005) (holding that the Eighth Amendment prohibits imposition of the death penalty on offenders who were under the age of eighteen when they committed the crime). Because the Defendant's initial waiver was conditioned on his mother's presence and his second waiver was a product of improper coercion, the circumstances surrounding the Defendant's waiver weigh against its validity.

Factor two, the juvenile's capacity to understand the Miranda warnings and the consequences of the waiver, and factor three, the juvenile's familiarity with Miranda warnings or the ability to read and write in the language used to give the warnings, also weigh against the validity of the waiver. Though there has been no suggestion that the Defendant cannot read and write in English, he had no prior experience with police and therefore was likely not familiar with Miranda warnings. As a juvenile, his capacity to understand the warnings was at least somewhat diminished. This diminished capacity was exploited by the improper threat of the death penalty, which misled the Defendant into believing that the consequence of exercising his right to remain silent might be death. See Kerby, 2007-Ohio-187, ¶ 87 (threat of death penalty deprived juvenile of capacity to waive Miranda rights, regardless of his maturity or intelligence).

Factor four, any intoxication, and factor five, any mental disease, disorder, or retardation, weigh in favor of the validity of the waiver. The Defendant has not alleged that he was intoxicated during the interrogation or that he suffers from any mental disorders.

Factor six, the presence of a parent, guardian, or interested adult, weighs heavily against the validity of the waiver. Though the majority is correct that a parent need not be present for a juvenile to validly waive his Miranda rights, this factor cannot be so easily dismissed. The absence of a parent always weighs against the validity of the juvenile's waiver. This weight, in my view, becomes greater when the juvenile is expressly denied access to his parent during his interrogation. See State In Interest of A.A., 222 A.3d 681, 692 (N.J. 2020) ("If law enforcement officers do not allow a parent and juvenile to consult in private, absent a compelling reason, that fact should weigh heavily in the totality of circumstances to determine whether the juvenile's waiver and statements were voluntary."); see also People v. Morgan, 758 N.E.2d 813, 834 (Ill. 2001) (the juvenile's opportunity to consult with his parent before or during the interrogation "is particularly relevant" when the juvenile has asked to speak with his parent or the police have prevented his parent from speaking with him). Where an adult seeking advice or seeking to end an

interrogation is likely to ask for an attorney, a juvenile seeking the same is likely to instead ask for a parent. See Fare v. Michael C., 442 U.S. 707, 729-30 (1979) (Marshall, J., dissenting) (a juvenile "will likely turn to his parents, or another adult responsible for his welfare, as the only means of securing legal counsel"). Denying a juvenile's request to speak with his parent should therefore hold significant weight in the totality of the circumstances analysis. See id. (Marshall, J., dissenting) (a juvenile's request for his parent "is surely inconsistent with a present desire to speak freely").

In this case, the Defendant was not only denied access to his mother, but was denied access to her after officers twice assured his mother that she could be present for the interrogation and after the Defendant requested to speak with her four times. At the outset of the interrogation, an officer tried to bring his mother into the room, and he was told to "hold off on that." At 2:52 a.m., thirty minutes into the interrogation and in response to being asked who shot the victims, the Defendant asked, "Can you get my mamma in here?" Investigator Williams denied his request because this was "grown up shit." Around 3:19 a.m., the Defendant asked to talk to his mother, and Investigator Williams told him he could "in just a second." At 4:03 a.m., the Defendant told Investigator Williams that he told him he could talk to his mother. Investigator Williams responded, "we'll get her in a minute." Around 6:02 a.m., the Defendant again asked to talk to his mother, and Detective Whitney said he could "in a minute." At no point during the six-and-a-half-hour interrogation, however, was the Defendant permitted to speak with his mother, or have her present during questioning. This intentional exclusion of the Defendant's mother contributed to the coercive nature of the interrogation and weighs heavily against the validity of the waiver.

Based on the totality of the circumstances, the Defendant's waiver of his Miranda rights was invalid. A valid waiver must be both "'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception'" and made "'with a full awareness of both the nature of the right being abandoned and the consequence of the decision to abandon it.'" State v. Climer, 400 S.W.3d 537, 564 (Tenn. 2013) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). A waiver obtained from a juvenile with no prior experience with police, after denying him access to his mother who was present at the station, and threatening him with the death penalty, cannot be said to be the product of a free and deliberate choice, nor to have been made with full awareness of the nature of the right and the consequence of abandoning it. Accordingly, the trial court erred in denying the Defendant's motion to suppress.

**B. Voluntariness of Confession**. Even if the Defendant's Miranda waiver was valid, the Defendant's confession should still have been suppressed because it was involuntary. After analyzing the totality of the circumstances under the Climer factors, I would have concluded that the trial court erred in finding that the Defendant's confession was voluntary. See 400 S.W.3d at 568.

The facts discussed in the above Miranda-waiver analysis are also relevant to the voluntariness analysis. The Defendant's perceived intelligence and lack of intoxication weigh in favor of the voluntariness of the confession. The threat of the death penalty and exclusion of the Defendant's mother from the interrogation, in addition to the Defendant's age and lack of previous experience with the police, weigh against the voluntariness of the confession. Before determining whether the confession was voluntary, however, the following post-waiver facts must also be considered.

The Defendant was interrogated for six-and-a-half-hours, from 2:21 a.m. to 8:51 a.m. The record preponderates against the trial court's finding that the interrogation was only one hour. This finding was seemingly based on the fact that the trial court was only shown the first hour of the interrogation during the suppression hearing. This also seems to be the reason the majority is focused primarily on the first hour of the interrogation. But the six-and-a-half-hour interrogation was recorded and, according to the suppression hearing transcript, provided to the trial court before the hearing. The recording from when the officers arrived at the Defendant's home as well as the full six-and-a-half-hour recording of the interrogation were also provided to this court on appeal. The length of the interrogation, and the fact that it occurred in the middle of the night, weigh against the voluntariness of the confession. See Haley v. Ohio, 332 U.S. 596, 599-600 (1948) ("we cannot believe that [a fifteen-year-old questioned from midnight to 5:00 a.m.] is a match for the police in such a contest").

To be clear, I strenuously disagree with the cavalier characterization by the majority that "[w]hile the defendant was interviewed off and on for six hours, he provided a significant portion of the statement in question and implicated himself in the murder after only one hour." The Defendant did not confess to shooting at the victims until he was detained, threatened with the death penalty, denied access to his mother, and questioned for over six hours. Though the Defendant admitted within the first hour of the interrogation that he was with the co-defendant when the co-defendant shot at the victims, he did not admit to possessing a gun and shooting at the victims until 8:34 a.m. For the first six hours of the interrogation, he adamantly denied having shot at the victims, or knowing that the co-defendant was going to. The length of the detention before the confession therefore weighs against its voluntariness.

Several of the officers' statements made during the interrogation also weigh against the voluntariness of the confession. First, as discussed above, Investigator Williams told the Defendant at the beginning of the interrogation that he was facing the death penalty. Second, Investigator Williams said he had video of the shooting that incriminated the Defendant when no such video existed. See Frazier v. Cupp, 394 U.S. 731, 739 (1969) (an officer's misrepresentation of evidence, though it does not alone render a confession inadmissible, is relevant to the voluntariness analysis). Third, Chief Sellers implied to the Defendant that he would be abused in prison. He said, "You know what they do to seventeen-year-olds in the [penitentiary]?" When the Defendant shook his head no, Chief

Sellers said, "I don't think you want to know." Fourth, Chief Sellers insinuated that a jury would not believe the Defendant was there but did not shoot. This insinuation, in light of the threat of the death penalty, led Defendant to believe that he would be convicted no matter what and his only chance to avoid the death penalty was to confess.

Based on the totality of the circumstances, the Defendant's confession was involuntary. Though I agree with the majority that the discussion about a polygraph and gunshot residue test was not improperly coercive, that the Defendant was not physically abused, and that he was provided food and water, these circumstances are outweighed by the circumstances that weigh against the voluntariness of the confession. The confession was obtained from a juvenile with no prior experience with the police, after over six hours of interrogation in the middle of the night, during which he was denied access to his mother and threatened with the death penalty. The totality of the circumstances therefore demonstrates that the Defendant's "will was overborne so as to render the confession the product of coercion." Climer, 400 S.W.3d at 568 (citing Dickerson v. United States, 530 U.S. 428, 433-35 (2000)). The record shows that the erroneous admission of the Defendant's confession was not harmless. Accordingly, if the juvenile court had properly transferred jurisdiction to the trial court, I would have reversed the judgments of the trial court and remanded for a new trial.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE